UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEFFREY PAANANEN, a Washington resident, | ) CASE NO. C08-1042 RSM ) |
| Plaintiff, | ) ORDER GRANTING IN PART AND ) DENYING IN PART DEFENDANT'S |
| v. | ) MOTION FOR PROTECTIVE ORDER ) |
| CELLCO PARTNERSHIP, a Delaware corporation, d/b/a VERIZON WIRELESS, a New Jersey Corporation, | ) ) ) |
| Defendant. | |

## **I. INTRODUCTION**

This matter comes before the Court on Defendant's Motion for Protective Order (Dkt. #26). Defendant objects to the temporal and geographic scope of Plaintiff's discovery requests as well as the scope of Plaintiff's inquiries into the termination of other employees. Additionally, Defendant claims that Plaintiff has exceeded the limit on interrogatories, and that Plaintiff's fifth set of requests for production are overly burdensome.

For the reasons set forth below, the Court GRANTS Defendants' motion with respect to the geographic scope of discovery, the scope of termination evidence, and the numerosity of Plaintiff's interrogatories. The Court DENIES Defendant's motion with respect to temporal scope and Plaintiff's fifth set of discovery requests.

ORDER
PAGE - 1

## II. Background

Plaintiff was employed by Defendant Verizon Wireless ("Verizon") as a retail salesperson from October 2003 until July 2006. Plaintiff performed exceptionally well as a retail salesperson and in July 2006, Verizon promoted Plaintiff to the position of Business Account Executive ("BAE") in Verizon's Business-to-Business ("B2B") division. When Plaintiff was promoted to the B2B division, he worked at a different worksite and was supervised by different managers. While Plaintiff's job in the retail division involved selling phones and accessories to individual retail customers, Plaintiff's job in the B2B division involved serving the communication needs of business customers, for example, providing a customer's employees with Blackberry phones and corresponding plans.

In September 2006, while Plaintiff was working as a BAE in the B2B division, Plaintiff's wife suffered a heart attack and was hospitalized. According to the complaint, Plaintiff notified his supervisor that he needed to stay with his wife and was told that he had to work from the hospital. Throughout October, Plaintiff requested to use his available vacation or sick leave time to stay at home with his wife. Plaintiff's supervisors refused his request because Plaintiff was required to ask for vacation time one month in advance.

In October 2006, Plaintiff was diagnosed with severe sleep apnea. With a doctor's note, Plaintiff requested five days off for treatment and to acclimate to sleep equipment his doctor prescribed. According to Plaintiff, none of his supervisors discussed medical leave options under the Family Medical Leave Act ("FMLA") with him.

On November 14, 2006, Plaintiff was diagnosed with severe depression. Plaintiff took medical leave starting that day. On December 21, 2006, Verizon terminated Plaintiff's employment.

Plaintiff brings this suit alleging that Verizon discriminated against him with regard to his sleep apnea and depression disabilities and violated FMLA by terminating him for taking emergency leave. Verizon claims that Plaintiff was not fired because of his health conditions due to taking medical leave, but was fired because his business customers complained that he added services and accessories to their cellular phone plans without their authorization.

## III. DISCUSSION

### A. Plaintiff's Interrogatories

Defendant moves the Court for a determination that Plaintiff has exceeded the interrogatory limit under the Federal Rules of Civil Procedure. Plaintiff served 21 numbered interrogatories in its amended first set of interrogaotries and one additional interrogatory, number 22, in its second set of interrogatories. Contending that Plaintiff's interrogatories 1, 4, 5, 6, 7, 8, 10, and 15 contained "discrete subparts" that put Plaintiff's interrogatories over the limit of 25, Verizon responded only partially to interrogatories 1, 4, 10, and 15. It is not clear whether it responded partially or fully to interrogatory 22.

A party may not serve more than 25 interrogatories on any other party without leave of the court. Fed. R. Civ. Proc. 33(a)(1). However, there is often a question of when an interrogatory which asks multiple questions or contains multiple subparts is in fact multiple interrogatories rather than one. The Advisory Committee addressed this issue:

> Each party is allowed to serve 25 interrogaotries upon any other party, but must secure leave of the court (or stipulation from the opposing party) to serve a larger number. Parties cannot evade this presumptive limitation through the device of joining as 'subparts' questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each communication.

Advisory Committee Note, 146 F.R.D. at 675-76.

Courts have done their best to formulate tests for when subparts are discrete. Interrogatory subparts are counted as one interrogatory if "they are logically or factually subsumed within and necessarily related to the primary question." *Safeco of America v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *see also Trevino v. ACB American, Inc.*, 232 F.R.D. 612, 614 (N.D. Cal 2006). Subparts relating to a "common theme" should generally be considered a single interrogatory. *Safeco*, 181 F.R.D. at 444 (quoting 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2168.1, at

261 (2d ed. 1994)). But 'if the first question can be answered fully and completely without answering the second question' then the questions are distinct. *Estate of Manship v. U.S.*, 232 F.R.D. 552, 555 (M.D. La. 2005) (quoting *Krawczyk v. City of Dallas*, 2004 WL 614842 (N.D. Tex. 2004)). Since many of these formulations are difficult to apply or perhaps even conflicting, some courts take a "pragmatic approach," looking to see if an interrogatory threatens the purpose of Rule 33 by combining into one interrogatory several lines of inquiry that should be kept separate. *Willingham v. Ashcroft*, 226 F.R.D. 57, 59 (D.D.C. 2005); *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 10 (D.D.C. 2004). With this in mind, the Court now turns to Plaintiff's interrogatories.

### 1. Interrogatory 1

Interrogatory number 1 states:

> For each owner, director, officer, employee, former employee, independent contractor, and agent of any Defendant since 2005, inclusive, who has worked as a co-worker, direct or second level superior, or direct or second level subordinate to Plaintiff, state his or her full name, present or (if present information is unavailable) last known address and telephone number, dates of employment (including dates of application, hire, promotion, demotion, and separation from the position, if applicable), job titles of positions held, and duties and responsibilities of positions held.

This interrogatory simply requests the employment history of employees who were Plaintiff's co-workers or who were within two levels of him. The subparts–the names, dates, titles, etc.–all relate to this common theme. The inquiry into the duties and responsibilities for each position is logically subsumed within the employment history inquiry because it is necessary in order to understand the job titles. Therefore, Interrogatory 1 is only one interrogatory.

### 2. Interrogatory 4

Interrogatory 4 states:

> As to the storage of data generated by the users of your computers (such as word-processed files and e-mail), please state whether the data are backed up on tape or other media and, if so state how many such media currently exist with backup data on them; what is the maximum storage size in megabytes for each such media; what is the brand name for each such media, including software and hardware; the dates of each back up during the three months before and after Plaintiff's termination; what was the computer or other hardware (e.g., individual workstation, server) for each such backup; and the physical location and current user of each computer or other hardware used.

This interrogatory also only inquires into one distinct area: Verizon's backup procedures. The types of media storage, their size and brand, which computers are backed up, and the timing of those backups are all secondary inquiries subsumed within the primary inquiry. The current user of each computer is not a separate line of inquiry because, in the context of this case, that information identifies which media, i.e. which computer, is backed up.

### 3. Interrogatories 5-8

Interrogatories 5 states:

> For the first affirmative defense asserted in Defendants' Answer, briefly summarize the facts upon which it is based; state all facts in support of the affirmative defense; identify (see definition) all persons with knowledge you contend supports that defense; and indentify (see definition) any documents directly related to that affirmative defense.

Interrogatories 6-8 are identical to 5 except that they ask about Verizon's second, third, and fourth affirmative defenses respectively. Each of these interrogatories involves two distinct inquiries. The first asks a defendant to summarize and state all the facts that support an affirmative defense. The second inquiry asks a defendant to identify the evidence (documents and witnesses) that support that affirmative defense. Even though the two inquiries do relate to the same theme, neither is subsumed within the other because the inquiry into the facts supporting a defense can be answered fully and completely without identifying the documentary support for those facts. The separate question of documentary support does not seek "who, what, when, where, and how" information, but instead asks a separate question: how do you know? *Manship*, 232 F.R.D. at 557; *see Willingham*, 226

ORDER
PAGE - 5

F.R.D. at 60 (citing Banks, 222 F.R.D. at 10) ("[A] demand for information about a certain event and for the documents about it should be counted as two separate interrogatories" because "knowing that an event occurred is entirely different from learning about the documents that evidence it occurred.")

### 4. Interrogatory 10

Interrogatory 10 states:

> If Defendants contend they conducted (an) investigation(s) into Plaintiff's discrimination claims, at any time, state when Defendants first learned of the matter which was investigated; who was responsible for conducting any investigation; what was the content of any investigation, including identification of documents reviewed and witnesses interviewed, as well as any other aspects of the investigation; what was the outcome or final decision of the investigation; and what, if any, action was taken as a result of the investigation.

This interrogatory also presents two lines of inquiry and should therefore be counted as two. The first line of inquiry asks Verizon to describe the procedural steps it took in conducting an investigation. When Verizon learned of the matter, who conducted the investigation, and what documents or witnesses were reviewed or interviewed are all subsumed into that primary inquiry. However, the interrogatory also inquires into "content" or results and outcome of the investigation–what Verizon actually found out–which is a discrete area of inquiry.

### 5. Interrogatory 15

Interrogatory 15 is phrased identically to Interrogatory 10 except it refers to Verizon's investigation into "the facts they contend support Plaintiff's termination." For the same reasons, this interrogatory should be counted as two.

Counting all discrete subparts, Plaintiff's Interrogatory 19 was actually his twenty-fifth interrogatory. However, Verizon did not fully respond to interrogatories 1-19 and ignored the rest. Instead, Verizon answered 1-22, but only partially answered 1, 4, 10, and 15 stating that

it would not answer the other subparts of those interrogatories because Plaintiff had exceeded the limit.

When a party exceeds the interrogatory limit set by the court or Rule 33, the responding party is not free to choose the interrogatories to which it will respond. Such a rule would allow the responding party to "selectively respond to the interrogatories and thereby strategically omit the most prejudicial information." *Herdlein Technologies, Inc. v. Century Contractors, Inc.*, 147 F.R.D. 103, 104 (W.D.N.C. 1993). Additionally, the party propounding interrogatories has a right to have 25 interrogatories of its own choosing answered fully and completely. *Id.* at 104-05; *see also* 7 James W. Moore, Moore's Federal Practice § 33.30 (3rd. ed. 1997) (noting that selecting interrogatories rather than answering them in numerical order "would clearly be improper").

Some courts have held that when a responding party responds to any interrogatories, that party waives its numerosity objection and must answer all interrogatories. *See Allahverdi v. Regents of the Univ. of New Mexico*, 228 F.R.D. 696, 698 (D.N.M. 2005); *IMA North America, Inc. v. Marlyn Nutraceuticals, Inc.*, 2007 WL 2391099 at \*3 (D. Ariz.). However, this Court declines to adopt such a rule because it would incentivize litigants to file protective orders in every case before responding to a single interrogatory. While litigants argue over the number of discrete subparts in one interrogatory, the entire discovery process could stall because the responding party will not respond to other interrogatories for fear of waiving an objection. Furthermore, a rule that a numerosity objection is waived after any interrogatory response fails to account for situations where parties submit their interrogatories in multiple sets. If a responding party answers an initial set of 15 interrogatories and is then served with 11 more, it would defy logic to hold that that party has waived its objection to the numerosity of the new set.

Accordingly, the best rule, and the one this Court applies here, is that a responding party must answer the first 25 interrogatories. If it answers more, the numerosity objection is waived as to those interrogatories that were answered. *See Capacchione v. Charlotte-Mecklenburg Schs.*, 182 F.R.D. 486, 492 (holding that a party making a supernumeracy

ORDER
PAGE - 7

objection to interrogatories must either seek a protective order or answer up to the limit and object to the remaining); Moore, *supra*, at § 33.30 ("[T]he better rule is to require the responding party to answer the first 25 interrogatories, and object to the remainder."). Here, Verizon did not respond fully to interrogatories 1, 4, 10, and 15. Since these interrogatories are within Plaintiff's first 25 counting discrete subparts, Verizon must respond in full. Verizon was not required to respond to interrogatories 20, 21, or 22, but it did anyway, thus waiving its objection to those interrogatories. Plaintiff may not serve any additional interrogatories without leave of the Court.

## B. Scope of Discovery

The Federal Rules of Civil Procedure allow for liberal discovery of any information that is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. Proc. 26(b)(1). In employment discrimination cases, evidence relating to the employer's treatment of employees similarly situated to the plaintiff is relevant for two reasons. First, such comparator evidence is relevant to prove that an employer discriminated against other employees and therefore had a discriminatory motive, that there was a pattern or practice of discrimination, or that the employer implemented policies that encouraged or permitted discrimination. *Heyne v. Caruso*, 69 F.3d 1475, 1479-80 (9th Cir. 1995); *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1362-63 & n.7 (9th Cir. 1985); *Garcia v. Courtesy Ford*, 2007 WL 1430196 at *2 (W.D. Wash. 2007). Secondly, evidence that similarly situated employees were treated differently is relevant to establish that an employer's stated reasons for termination are pretextual. *Minority Employees at NASA (MEAN) v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983); *Diaz*, 752 F.2d at 1363 & n.8; Garcia, 2007 WL 1430196 at *2; *Curry v. Morgan Stanley & Co.*, 193 F.R.D. 168, 174 (S.D.N.Y. 2000); *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 527 (D. Nev. 1997).

Discovery in employment discrimination cases is especially broad. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 658 (11th Cir. 1983); *Rich v. Martin*, 522 F.2d 333, 343-44 (10th Cir. 1975); *see also Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3rd. Cir. 1995) ("[I]n

particular, we frown upon unnecessary discovery limitations in Title VII, and hence ADEA, cases.); This is because "employers rarely leave a paper trail–or 'smoking gun'–attesting to discriminatory intent" and "disparate treatment plaintiffs often must build their cases from pieces of circumstantial evidence that cumulatively undercut the credibility of various explanations offered by the employer." *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2nd Cir. 1990); *see also U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). However, even in employment discrimination cases, discovery has necessary boundaries and a court must balance the need for potentially relevant information with the burden and expense of producing it.

In this case, Plaintiff has served over one hundred discovery requests. Because that number is large and because Plaintiff and Verizon disagree about the proper scope for a great many of them, they argue in their briefs over the proper workplace scope and temporal scope *in general*, but not with respect to individual discovery requests. This presupposes that the proper scope is the same for every request, which is not altogether obvious. Below, the Court does its best to sort out the broad disagreements so that this case may move forward. However, there may be specific discovery requests that require a different scope than outlined below due to the nature of those requests. If that situation arises and the parties cannot come to an agreement, the parties will have to bring motions addressing specific requests and explaining why the scope described below is inappropriate for those requests. With that word of caution, the Court now addresses the parties' scope arguments.

### 1. Parties' Agreement

As a preliminary matter, Verizon argues that Plaintiff and Verizon agreed during a telephonic Rule 37 conference to limit the scope of discovery to: (1) evidence relating to individuals who were employed by Verizon in Pacific Northwest Region B2B under the

direct or indirect supervision of Eddie Ellard,[1] and (2) the six month time period of Plaintiff's employment as a BAE in the B2B division from July through December 2006. Verizon argues that Plaintiff should be held to this agreement.

The evidence is insufficient for this Court to find that such an agreement was reached. First, Plaintiff's counsel denies that such an agreement was made. Secondly, even though there has been copious correspondence between the parties' counsel over the last several months, including e-mails and letters, none of these documents evidences an agreement. Finally, based on the contents and tone of the four hundred pages of discovery correspondence this Court has reviewed, it seems unlikely that Plaintiff would have agreed to such limits on scope.

### 2. Geographic or Workgroup Scope

Verizon maintains that discovery should be limited to information relating to employees in the B2B division under the direct or indirect supervision of Mr. Ellard, who was Plaintiff's second-tier supervisor. Plaintiff argues that he is also entitled to evidence relating to employees of the retail channel where Plaintiff previously worked prior to being promoted to the B2B channel.

As explained above, information regarding other employees is relevant both to prove a discriminatory environment and to prove pretext by showing that other employees that committed the same violations as Plaintiffs were not terminated. The relevance of this evidence heavily depends on whether these other employees are similarly situated to Plaintiff so that a comparison is meaningful. *See Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994) (noting that "other employees' circumstances [must be] close enough to [plaintiff's] to make comparison's productive"). Comparator evidence is most relevant when the other employees work at the same part of the company as Plaintiff, have the same performance, qualifications, and conduct, and have a common supervisor. *Balderston v. Fairbanks Morse*

---

[1] Plaintiff's immediate supervisor in the B2B division was Locke Bradley, an Associate Director of Business Sales. Mr. Ellard is the Director of Business Sales for the Pacific Northwest Region and is Mr. Bradley's supervisor.

ORDER
PAGE - 10

*Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003); *see also* Curry, 193 F.R.D. at 174 (holding that employer's officers were not similarly situated to plaintiff and therefore "their expense account practices can have no bearing on whether [plaintiff] was properly dismissed for expense account abuse."). Typically, this means that discovery in employment cases is limited to the employing unit absent a particularized need for information from other divisions. *Garcia*, 2007 WL 1430196 at *3; *Chavez v. Daimlerchrysler Corp.*, 206 F.R.D. 615, *Haselhorst v. Wal-Mart Stores, Inc.*, 163 F.R.D. 10, 11 (D. Kan. 1995); s*ee Balderston*, 328 F.3d at 320 (affirming district court's decision to limit discovery to the relevant corporate department); *Scales v. J.C. Bradford and Co.*, 925 F.2d 901, 907 (6th Cir. 1991) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir. 1990) ("Where, as here, the employment decisions were made locally, discovery may be properly limited to the employing unit."); *Jackson*, 173 F.R.D. at 528 (interrogatory answers restricted geographically to the facility where plaintiff was employed).

Plaintiff's have not shown any particularized need for discovery relating to Verizon's retail channel. Employees in the retail channel work in a separate location and under different supervisors. They are not similarly situated with respect to job performance because retail channel employees sell plans involving a single phone or a few phones to individuals in one-time transactions while B2B salespersons sell communications plans encompassing sometimes hundreds of phones or other communications devices in customized contracts that vary from customer to customer.

Plaintiff argues that discovery from the retail channel will show that Verizon strongly encouraged retail salespersons, including Plaintiff when he worked in that division, to sell "complete solutions" or packages including phones, accessories, calling plans, and other services. According to Plaintiff, Verizon's allegedly pretextual reason for terminating him was that he "add[ed] on accessories and services as packages in precisely the way in which he was trained as a retail sales associate" and therefore the training and discipline of retail salespersons is relevant. (Plaintiff's Response, Dkt. #29 at 9). This misstates Verizon's purported reason for terminating Plaintiff. Verizon's position is that it terminated Plaintiff for

ORDER
PAGE - 11

adding services and accessories to customers' plans *without authorization*. Plaintiff does not claim in his brief, declarations or elsewhere, that the culture in the retail sales channel encouraged the unauthorized addition of accessories.

Secondly, even if there were evidence that retail channel employees were not terminated when engaging in the exact conduct for which Plaintiff was fired, that evidence would not be relevant because retail employees and B2B employees have different jobs. Conduct that is acceptable in one position is not necessarily acceptable in an entirely separate position. This is especially true in cases like this one where the conduct leading to termination is job related. The retail channel sales employees are simply not similarly situated to Plaintiff. *See Curry*, 193 F.R.D. at 174 (expense account practices of employees not similarly situated to plaintiff "have no bearing on" whether plaintiff's termination for expense account abuse was pretextual).

The differences between this case and *Garcia*, which was cited and discussed at length by Plaintiff, are instructive. 2007 WL 1430196. In *Garcia*, the plaintiff worked as a Finance and Insurance Manager ("F & I Manager") at Courtesy Auto Group dealerships from 1998 to 2005. From 1998 to 2001 she worked at the Courtesy Ford dealership, and from 2001 to 2005, she worked at the Gig Harbor Ford dealership doing the same job. The same man, Rick Hern, was the president of both dealerships, although the two dealerships had different managers. When Garcia was terminated, she sued alleging she was terminated so the dealership could avoid a period of FMLA leave. The defendants contended that she was terminated for her failure to complete "kiss sheets" following sales transactions. *Id.* at *1. Noting that it was a "close call," Judge Lasnik held that kiss sheets and related statistics from the Courtesy Ford dealership were relevant to support the plaintiff's pretext argument. *Id.* at *3. He relied on the fact that the kiss sheets for the Gig Harbor and Courtesy Ford dealerships were essentially the same and that the record was not clear on whether the kiss sheet policy was the same across all dealerships. *Id.* Most importantly, the court noted that there was evidence that Mr. Hern, the president of both dealerships, consulted with the manager of the Gig Harbor dealership regarding the plaintiff's termination. Because this

meant that employment decisions were being made by the same person across both dealerships, not locally, this "weigh[ed] significantly toward finding F & I Managers at Courtesy Ford [were] similarly situated to plaintiff." *Id.*

This case differs from *Garcia* in at least two important respects. First, while Garcia performed the same job, involving the same kiss sheets, at both the Courtesy Ford and Gig Harbor dealerships, Plaintiff's jobs in the retail channel and B2B channel were significantly different. This is critical because it means there is no reason to expect the standard of acceptable job-related conduct to be the same in both positions. Second, the B2B channel and retail channel, unlike the two dealerships in *Garcia*, are managed by a completely different set of supervisors that do not consult each other when making termination decisions. *See Scales*, 925 F.2d at 907 (quoted in *Garcia*, 2007 WL 1430196 at *3) ("Where, as here, the employment decisions were made locally, discovery may be properly limited to the employing unit."). Those distinctions turn the "close call" in Garcia into a different call in the other direction.

The question remains what the scope of discovery should be within the B2B channel. Case law indicates that the scope of discovery is usually limited to information regarding employees with the same supervisor as the plaintiff. *See, e.g.*, *Chavez*, 206 F.R.D. at 621. In this case, that would be too narrow because Plaintiff's immediate supervisor, Mr. Bradley, does not supervise many employees. Instead, Verizon has gone one level higher, providing discovery related to employees supervised indirectly by Mr. Ellard, who is Mr. Bradley's supervisor. This amounts to approximately 24 employees. Such a scope seems reasonable in this case. Plaintiff asserts in his answer to Verizon's interrogatories that "most, if not all, BAEs with whom he worked engaged in [the conduct for which he was terminated]." (Burt Declaration, Exhibit II at 431). If that is indeed the case, the scope imposed will give Plaintiff access to the evidence he needs to prove his case. In any event, Plaintiff did not argue that the scope of discovery within the B2B channel should be broader than those

employees supervised by Mr. Ellard. Accordingly, discovery regarding comparator evidence shall be limited to that workgroup.[2]

One final note is necessary. While comparator evidence, that is evidence regarding Verizon's treatment of other employees, should be limited to Mr. Ellard's workgroup, that does not mean that absolutely all information relating to Plaintiff's work in the retail group is undiscoverable. Evidence directly relating to Plaintiff, including his training regarding the sales of packages, may be relevant.

### 3. Temporal Scope

Plaintiff's initial discovery requests pertained to information relating to the time period January 1, 1990 to the present. Verizon, however, has only produced documents pertaining to the six month time period of Plaintiff's employment as a BAE and moves for a protective order declaring that to be the proper temporal scope in this case. Plaintiff, rightly abandoning his initial requests for 18 years of documentation, responds that the proper temporal scope is the duration of his employment with Verizon, both as a BAE and as a retail salesperson, which spanned from October 2003 to December 2006.

Verizon argues that this Court already decided the temporal scope of discovery in its previous discovery order (Dkt. #25). It cites this Court's statement that, "[t]he facts and circumstances giving rise to Plaintiff's claims obviously occurred during Plaintiff's employment with Defendant." (*Id.* at 3). When read in context, it is clear that this sentence did not imply that all information pertaining to events occurring before Plaintiff's employment as a BAE were irrelevant or undiscoverable. The Court was merely explaining why communications between Plaintiff and Verizon occurring *after* Plaintiff's termination were not relevant and not reasonably calculated to lead to admissible evidence. In fact, in that very same order, the Court allowed discovery of Plaintiff's medical records for the past five years. (*Id.* at 3-4). While it is true that the facts and circumstances giving rise to Plaintiff's claims

---

[2] It is unclear from the record whether Mr. Ellard was working for Verizon in October 2003. If he was not, the scope includes those employees working under the person Mr. Ellard replaced.

ORDER
PAGE - 14

occurred during his employment as a BAE, evidence predating his employment may be relevant to proving discriminatory intent or pretext.

The temporal scope of discovery must be broad enough to allow a plaintiff claiming discrimination to be able to find evidence of other discrimination or evidence of other similarly situated employees who committed the same wrongful conduct as plaintiff but were not terminated. At the same time, it cannot be so broad as to be overly burdensome. Courts typically strike a balance in the range of three to eight years, although this varies based on the particular circumstances of the case. *See Burks v. Oklahoma Pub. Co.*, 81 F.3d 975, 981 (10th Cir. 1996) (district court could conclude that information for the past 10 years was overly burdensome and irrelevant.); *General Ins. Co. of Am. v. EEOC*, 491 F.2d 133, 136 (9th Cir. 1974) (trial court's ruling that eight years was unduly broad was not abuse of discretion); *Waters v. U.S. Capitol Police Bd.*, 216 F.R.D. 153, 159 (D.D.C. 2003) (nine years, including four years before plaintiff was employed, was proper scope); *Pleasants v. Allbaugh*, 208 F.R.D. 7, 10 (D.D.C. 2002) (in claim for discrimination in failing to upgrade plaintiff's position, three and a half years before the non-upgrade was the proper scope); *Milner v. Nat'l Sch. Of Health Tech.*, 73 F.R.D. 628, 632 (E.D. Pa. 1977) (six and one-half years was proper scope).

Here, six months is unreasonably narrow. If Verizon's termination of Plaintiff was in fact pretextual, Plaintiff cannot be expected to find evidence of that in only six months worth of discovery. Plaintiff's proposed scope, the entire length of Plaintiff's employment from October 2003 to December 2006 is reasonable. Accordingly, October 2003 through December 2006 is the proper temporal scope for comparator information.[3] Verizon's motion for a protective order is denied with respect to this issue.

---

[3] When combined with the Court's ruling on workgroup scope, this means Plaintiff is entitled to information regarding BAEs working in the B2B division under Mr. Ellard before Plaintiff was working as a BAE.

ORDER
PAGE - 15

### 4. Scope of Termination Evidence

Verizon objects to Plaintiff's requests for documents pertaining to employees who were disciplined or terminated for any reason. Verizon argues that only documents relating to disciplines and terminations for "slamming,"[4] "improper sales," and/or violations of Verizon's Selling with Integrity or Consumer Clear Disclosure policies are relevant. Plaintiff has not argued otherwise, and this Court agrees that terminations for reasons not related to the reasons Plaintiff was terminated are overbroad and not reasonably calculated to lead to admissible evidence.

### C. Plaintiff's Fifth Set of Requests for Production

Finally, Verizon objects to Plaintiff's fifth set of requests for production, which it views as overly broad and unduly burdensome. Because this Order will resolve many of the scope issues involved in those RFPs, and because Verizon did not argue regarding individual RFPs, it is proper to deny this motion at this time. If in light of this Order and after further discussions among counsel, the parties still cannot come to agreement regarding these RFPs, the parties should file discovery motions including their arguments with respect to each individual request. However, the Court reminds counsel that the prevailing party, in a motion to compel, may be awarded attorney fees and costs.

//
//
//
//
//
//

---

[4] Although not explained, "Slamming" appears to be the industry term for the conduct for which Plaintiff was allegedly fired, adding accessories without authorization.

ORDER
PAGE - 16

## IV. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motion for Protective Order (Dkt. #26) is GRANTED IN PART AND DENIED IN PART as explained above.

(2) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 8th day of October, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE